[No. 22649. Department One. January 8, 1931.]

W. D. THOMSON, *Respondent*, v. THE CITY OF SEATTLE, *Appellant.*[1]

*A. C. Van Soelen, C. C. McCullough,* and *Douglas D. Mote,* for appellant.

*Carkeek, McDonald & Harris (H. C. Tingvall,* of counsel), for respondent.

PARKER, J.—The plaintiff, Thomson, seeks recovery of damages for personal injuries claimed as the result of being struck by one of the city's street cars while it was being negligently operated by one of the city's employees. The case proceeded to trial in the superior court for King county, sitting with a jury. By appropriate motions made at the close of the plaintiff's evidence and at the close of all of the evidence, counsel for the city challenged the sufficiency of the evidence

[1]Reported in 294 Pac. 979.

to sustain any recovery by Thomson. These motions were by the court overruled and the case submitted to the jury, which resulted in a verdict awarding Thomson recovery against the city in the sum of $500.

Thereafter, by motion for judgment notwithstanding the verdict, counsel for the city again challenged the sufficiency of the evidence to sustain any recovery by Thomson, and thereafter counsel for Thomson moved for a new trial. The city's motion for judgment notwithstanding the verdict was by the court denied. Thomson's motion for a new trial was granted. The city has appealed to this court from the order of the superior court granting to Thomson a new trial, claiming error in the rulings of the trial court denying the city's challenges to the sufficiency of the evidence to sustain any recovery by Thomson. Our present inquiry is confined to the questions of the city's negligence and Thomson's contributory negligence; that is, as to whether either of these questions can, under the evidence, be rightly withdrawn from the consideration of the jury and decided by the court as a matter of law.

The controlling facts, as the jury was warranted in viewing them, we think, may be sufficiently summarized as follows: In Seattle, in the vicinity of the place in question, Westlake avenue runs north and south along the westerly shore of Lake Union. As platted, the street is very wide. Its east platted boundary seems to be in the water a short distance beyond the shore line. Along its west boundary line is a concrete sidewalk. Adjoining this sidewalk on the east is a paved vehicle roadway twenty feet wide, for southbound traffic. Adjoining that roadway on the east is an unpaved dirt strip, six feet wide, called a parking strip, where automobiles are parked. Adjoining that

strip on the east is another paved vehicle roadway for north-bound traffic.

Adjoining that roadway on the east is a platform, six feet wide and sixty feet long, maintained by the city for the taking on and letting off passengers from its south-bound street cars running on a track adjoining that platform on the east. Immediately to the east of that street car track is another street car track upon which runs the city's north-bound street cars. Adjoining that track on the east is another platform, six feet wide and sixty feet long, maintained by the city for the taking on and letting off passengers from its north-bound street cars. The north ends of these platforms are connected by a board walk, six feet wide, on the same level, that is, on the same level as the street car tracks. There is a railing along the west line of the west platform, with an opening six feet wide at the north end, which furnishes the only convenient access for pedestrians coming onto the platforms from the west, from which direction most of the street car passengers come to board the street cars from the east as well as the west platform.

The platforms lie within the apparent sixty-foot projected width of Wheeler street, which street comes into Westlake avenue from the west. Whether or not Wheeler street is actually platted across the avenue to or into the water of Lake Union is not clear by this record; but in any event it is clear that the opening in the railing at the north end of the west platform, the north ends of the platforms and the crosswalk connecting them, are used, not only as a crossing by the street car passengers, but are also used as a crossing by a large number of persons living in houseboats on the waterfront of Lake Union to the east of the street car tracks. The platted portion of Westlake avenue east of the east paved roadway is unimproved for ve-

hicle traffic. The platforms and street car tracks are about a foot above the level of the roadway pavement.

Thomson lives on a houseboat on the water of Lake Union east of the platforms, and his convenient and his usual way, as it is of others living in the houseboats, is to go to and from his houseboat over the north end of the platforms and over the street car tracks on the crosswalk connecting the platforms. Some 350 feet north of these Wheeler street platforms are other similar platforms at Halliday street where the street car tracks curve to the west. A person at the Wheeler street platforms can plainly see a street car at, and for some considerable distance beyond, the Halliday street platforms, and can at night see the lighted windows of the street car on its west side at and beyond that point; this because of the westerly curving of the street car tracks.

At about ten o'clock of the night in question, Thomson and one Heinze, a fellow workman, had completed their day's work. Heinze had an automobile which he used in driving from his home to his work and return. He lived a. mile or more north of where Thomson lived. His way from his work to his home was northerly along Westlake avenue. Upon the completion of their day's work, they started home together, Thomson riding with Heinze. When they arrived opposite the north end of the Wheeler street platforms, Heinze parked his automobile on the parking strip. They then went across the platforms and crosswalk over the street car tracks to Thomson's home in his houseboat, where they smoked and visited for a short time. Heinze then went back over the street car tracks to his automobile the same way, Thomson accompanying him merely in a social way to bid him good night. As Heinze started his automobile, they bid each other good night.

Thomson then stepped from the parking strip east upon the paved roadway to some three or four feet from its western edge. He then stopped and looked for south-bound automobile traffic, and, seeing none, looked north for a possible approaching street car along the west street car track. He then saw a street car coming from the north at about the turn of the track at Halliday street, some 350 feet to the north. He judged it was about at the turn, because he then saw the lighted windows on the west side of the car. He then proceeded to within two or three feet of the east side of the paved roadway when he again saw the approaching car, as he thought, some 250 feet or more away. He then saw, as he claims, only the somewhat dim outline of the street car and its somewhat dimmed headlight. This dimness, he claims, was the result of the foggy condition of the atmosphere. Being then of the opinion that he had plenty of time to cross the track before the street car would come to the crossing, he proceeded without further noticing the street car.

Just as he arrived slightly beyond the east rail of the west street car track, the car struck him and knocked him some twenty-five feet to the south and somewhat east, where he lit between the two street car tracks. Manifestly, he was struck by the front left corner of the street car, seemingly rendering it plain that had he had but an instant more time he would have passed clear of the approaching street car. Heinze testified that he thought the street car was running thirty to thirty-five miles an hour when about 150 feet north of the platforms, he having noticed the speed of the street car as it approached and passed him soon after he started in his automobile north along the east paved roadway. The street car was stopped, the motorman using an emergency method

to that end, with its rear end about ten feet south of the south end of the platforms.

The platforms are sixty feet long and the street car is forty-three feet long, so it becomes apparent that the street car ran about 113 feet before it could be stopped, even by using an emergency method to that end. Thomson was very uncertain as to the speed of the street car, other than he said that it was going very fast. He seems to have been conscious of its going very fast even when he saw it the second time at a distance of some 250 feet north of his position near the east edge of the paved roadway, and just before he went upon the north end of the west platform. Thomson says that he heard no bell or warning sounded from the street car at any time.

The question of the negligent operation of the street car as a proximate cause of Thomson's being injured, we think, was for the jury to decide as a question of fact, and not for the court to decide as a question of law. It seems to us that the much-used public crossing where the street car struck Thomson called for the same degree of care in the operation of the street car as upon its approach to any other similarly used pedestrian crossing at a street intersection, though that was not in the full sense, we may assume, a street intersection. The speed of the street car and its lack of control on approaching the crossing was such that the jury might well conclude from the evidence, constituted negligence and was a proximate cause of Thomson's being injured. So, we conclude that we cannot decide that the trial court was in error in refusing to take that question away from the consideration of the jury and decide it, as a matter of law, in favor of the city.

The more difficult question is, Was Thomson guilty of such contributory negligence as constituted

a proximate cause of his being injured that the trial court should have withdrawn that question from the jury and decided it in favor of the city as a matter of law? We have seen, according to Thomson's testimony, that, when he was on the east paved roadway at about two or three feet of its east edge, he saw, the second time, the approaching street car some 250 feet to the north. This would place him within about nine feet of the west rail of the west street car track, so that he would have only about fifteen or sixteen feet to go to be clear of the street car's course of travel. If these distances be approximately correct, and we think the jury might so conclude, or at least conclude that Thomson had good cause to believe and did honestly believe them to be correct, we think it should not be decided, as a matter of law, that he was guilty of such contributory negligence as to prevent his recovery for the injury he suffered; though we may concede that the evidence furnishes very substantial ground for arguing to the jury, as a matter of fact, that he was guilty of such contributory negligence as called for a verdict to be rendered denying him recovery from the city.

This is simply another case of whether or not Thomson was justified in proceeding to cross the track as he did. As here presented, we think that was a question of fact for the jury to decide, and not a question of law for the court to decide, and that therefore the trial judge did not err in declining to withdraw the case from the consideration of the jury. The following of our decisions, we think, are in harmony with and support our conclusion, though we do not cite all of them as being exactly in point: *Johnson v. Seattle*, 113 Wash. 487, 194 Pac. 417; *Goldsby v. Seattle*, 115 Wash. 566, 197 Pac. 787; *Plastino v. Seattle*, 119 Wash. 195, 205 Pac. 404; *Swanson v.*

*Pacific Northwest Tr. Co.,* 121 Wash. 96, 208 Pac. 10; *Ridgeway v. Lewis,* 125 Wash. 316, 216 Pac. 355; *Demase v. Nemitz,* 144 Wash. 404, 258 Pac. 25; *Fisher v. Tacoma R. & Power Co.,* 148 Wash. 122, 268 Pac. 180; *Hoyer v. Spokane United Railways,* 153 Wash. 450, 279 Pac. 742.

We conclude that the order of the superior court awarding to Thomson a new trial must be affirmed. It is so ordered.

MITCHELL, C. J., MAIN, TOLMAN, and HOLCOMB, JJ., concur.